# Brown, Early & Co. *versus* Susquehanna Boom Company.

1. A boom company was authorized by its charter to construct and maintain a boom across a certain river, and was required by said charter at all times to keep and maintain said boom sufficiently strong to secure all the lumber contained therein.  In an action against such company to recover damages for the escape of certain logs from the boom :

   *Held,* that the company was liable for any loss occasioned by the insufficiency of the boom, and that upon proof of a loss, such insufficiency would be presumed without evidence of negligence :

   *Held,* nevertheless, that if such loss occurred from the unavoidable dangers of the river, or through inevitable accident, the company was not liable.

2. Two boom companies having different booms on the same river were consolidated.  Both of them had been required by their charters to erect and maintain booms sufficiently strong to secure all the lumber contained therein.  By the Act of consolidation the consolidated company had all the rights and privileges, and was subject to all the restrictions contained in the charters of the companies forming it.  In an action against the consolidated company to recover damages for the loss of lumber, which had escaped from the upper boom and had not been stopped by the lower one :

   *Held,* that the company was not bound to construct the lower boom so as to catch lumber carried away from the upper boom by the act of God, but that its liability as to such lower boom was confined to rendering it secure for the logs destined therefor and driven into it.

3. Where a case has been submitted to the court under the provisions of the Act of April 22d, 1874 (P. L., 109), the Supreme Court will not, on writ of error, review findings of fact by the court below.

February 17th, 1885.  Before MERCUR, C. J., GORDON, TRUNKEY and CLARK, JJ.  PAXSON, STERRETT and GREEN, JJ., absent.

ERROR to the Court of Common Pleas of *Lycoming county :* Of January Term, 1884, No. 305.

This was an action on the case by James V. Brown et al., doing business under the firm name of Brown, Early & Co., against the Susquehanna Boom Company, to recover damages for the loss of certain lumber belonging to the plaintiffs, which escaped from the boom of the company defendant.

The parties, by writing filed, waived a trial by jury, and, under the provisions of the Act of 1874, the case was tried before CUMMIN, P. J., whose findings of fact and conclusions of law were as follows :—

The plaintiffs, Brown, Early & Co., were the owners of an extensive saw mill property in the city of Williamsport, Pennsylvania, on the west branch of the Susquehanna river.  In

the years 1867 and 1868 they procured large quantities of saw logs on the upper waters of the river to stock their mill. These logs, after they were measured (scaled) on the bank and marked (stamped) with the registered marks of the plaintiffs, were by them rolled into the small streams on which they were banked and were thence driven into the Susquehanna boom. After the logs came into the boom a large quantity of them escaped therefrom in the years 1867 and 1868, went down the river and were wholly lost to the plaintiffs. To recover damages for this injury this action is brought against the Susquehanna Boom Company, defendants.

The Susquehanna Boom Company is a corporation created and existing by virtue of an Act of Assembly, entitled, "An Act to incorporate the Susquehanna Boom Company," approved March 26th, 1846, and its supplements. The powers of the corporation are set forth in the second section of the original charter, as follows: "The said corporation are authorized and empowered to erect and maintain on the west branch of the Susquehanna river, between the borough of Williamsport and the mouth of the Quineshehocque creek, such boom or booms with piers as may be necessary for the purpose of stopping and securing logs, masts, spars and other lumber floating upon said river, and to erect such piers, side branch or sheer booms as may be necessary for that purpose : *Provided*, That said booms be so constructed as to admit the safe passage of rafts and boats, and not impede the navigation of said river and the branches thereof: *And provided also*, That all persons shall have the same privilege of landing rafts of logs, masts, spars, boards or other lumber, and fastening the same, as they have heretofore enjoyed; and the said corporation shall construct, and at all times keep and maintain their booms and piers sufficiently strong to secure all the lumber contained therein; but no person shall be allowed at any time to encumber said boom with rafts either of logs or other lumber."

The boom of the defendant was constructed in accordance with the charter and has been successfully operated thereunder for many years. It consists of a large number of timber crib piers filled and loaded with stone, connected together by timbers or platforms of timber, between the piers, fastened at each end by strong cable chains to the piers. These piers are comparatively solid, very heavy, and rest securely on the bottom of the river, the platforms float on top of the water between the piers, and are held in their places by the chain coupling at each end attached to the piers. These platforms rise and fall with the floods, thus allowing almost a free passage of the water and affording greater certainty and security for catching and holding the saw logs that come in on the sur-

face of the water. The piers are about two hundred feet apart and the platforms consist of heavy timbers bolted together so as to make a width of about six feet. The lower end of the boom is fastened to the south shore of the river a short distance above the old borough of Williamsport, and extends thence three miles or more up the river, so slightly diagonally across, that in the whole distance, it does not at the head occupy more than about two thirds of the width of the river.

Above the boom proper is what is called a sheer boom, which is about fourteen hundred feet long ; its purpose is not to catch and hold logs, but to sheer them into the boom proper. This sheer boom extends from the head of the boom proper upwards and towards the north shore of the river ; it is fixed at a greater angle to the current of the stream than the boom proper, and was held in place by cable chains fastened to piers that were below the water, called blind piers. Next above the sheer boom is the fly boom ; this is about two hundred and fifty feet long ; consists of a platform of timber and extends from the upper end of the sheer boom to the north shore of the river. When the fly boom is shut the entire navigation of the river is closed. The fly boom is arranged to be opened and shut at pleasure, and its purpose is not to hold logs but to sheer stray logs over to the sheer boom that they may thence pass into the boom proper.

The usual spring floods at this boom, which are called good packing floods, are from fifteen to eighteen feet above low water mark. When the logs come into the boom on a good packing flood, the action of the water is such that the logs are forced under, over and between each other in such a mass that the whole body becomes packed and fastened solidly to the bottom of the river. In many places there will be no pressure whatever on the boom platforms, and in such places, if they were taken away, the logs would not escape. When the logs come in on anything near the usual and ordinary spring floods, the boom has always been of sufficient size and strength to hold all the logs and more than ever came in. If the logs come into the boom on very high water, as the flood of 1865, which was twenty-eight feet above low water, no boom structure will hold them.

There are two well defined accidents which may happen to this boom, as follows :—

First. If the logs come into the boom on such low water that they will not pack but remain on the surface of the water, the boom will not hold one half as many logs, and will soon fill up to its head. If, then, there should be a slight rise in the river, or if for any other cause this vast body of logs

should surge down, as they will do, some logs may be forced on top of the boom platforms and cause them to sink under the water, thus making an outlet whereby the great pressure is relieved. The boom platforms being thus sunken, the logs are forced out of the boom at this point, soon a channel is thus made and a large quantity of logs will surely escape. This is called a " spew " of logs. It is impossible to prevent this accident. No man can tell when or where it will occur, and the strength or weakness of the boom structure has nothing to do with its occurrence. No part of the boom structure is broken by this accident. This is the kind of accident which occurred when the plaintiffs' logs were lost in 1867, for which they bring their action.

Second. If the logs come into the boom on such low water that they will not pack but remain on the surface of the water, the boom will not hold one half as many logs and will soon fill up to its head. If, then, no rise in the water or other thing occurs to cause the logs to surge down in the boom, it is certain and inevitable that all logs coming down after the boom is full must go by the boom and be lost. This is called an " overflow " of logs. This was the situation immediately before the accident happened when the plaintiffs' logs were lost in 1868. To prevent an " overflow " of logs the defendant closed the fly boom, strengthened the sheer boom by adding timbers to the platforms until they were about twenty-one feet in width, drove heavy piles into the bed of the river below but against these platforms, fastened the sheer boom to the south shore by a strong wire cable, bought up several timber rafts and lodged them against the piers of the railroad bridge, thus making a timber jam a few hundred feet above the sheer boom to relieve the pressure on it. After all this was done the logs continued to come, the pressure continued to increase, soon it became too great ; the sheer boom broke and a large quantity of logs escaped, including the logs of the plaintiffs which were lost in 1868, for which their suit is brought. No part of the boom proper was broken in this accident, and no more logs were lost than would probably have been lost if the " overflow " had not been arrested.

The first question raised in this case is one going to the jurisdiction of the court. By the third section of defendant's charter it is thus provided :—

" If any person or persons shall suffer damage by the exercise of powers herein granted to said corporation, and the amount thereof cannot be agreed upon by the parties, nor some suitable person or persons agreed upon to estimate the same, the Court of Common Pleas having jurisdiction in the county where the boom or booms are situated shall, upon ap-

plication of the party aggrieved, cause said damages to be ascertained by three disinterested freeholders of the same county, to be appointed by said court, and who shall make report to the said court on or before the first day of the term next after the award shall have been made, and which being confirmed by the court, shall have the effect of a judgment from the time of such confirmation, &c., &c."

It is urged that if the plaintiffs have any claim for damages against the defendant, they must proceed under this clause of the charter, and hence cannot maintain an action at law. In support of this view, the Act of Assembly of 21st March, 1806, § 13 ; 4 Sm. L., 332 ; Purd. Dig., p. 58, pl. 5, is cited as follows :—

" In all cases where a remedy is provided or duty enjoined, or anything directed to be done by any Act or Acts of Assembly of this Commonwealth, the directions of said Acts shall be strictly pursued, and no penalty shall be inflicted or anything done agreeably to the provisions of the common law in such cases, further than shall be necessary for carrying such Act or Acts into effect."

If the plaintiffs' claim in this case falls within the class of damages for which a remedy is provided in the charter of the company, then this action at the common law cannot be maintained : Koch v. Williamsport Water Co., 15 P. F. S., 288.

That the case at bar is within the class of cases provided for in the charter, the case of Bald Eagle Boom Co. v. Sanderson, 32 P. F. S., 402, is referred to, wherein the exact words of this part of the charter were before the court. In that case, however, the boom company did what it had authority to do. It allowed its boom to be filled with logs ; this caused the water to flow back upon Sanderson's land, which was the injury complained of. In other words, Sanderson in that case suffered damage by the exercise of the powers granted to the boom company. The case at bar is widely different. If Brown, Early & Co. have any claim in this case against the Susquehanna Boom Company, it is not because the boom company exercised the powers granted to it, but because it did not do so, or neglected to do so. The case at bar comes within the principle laid down in Schuylkill Nav. Co. v. McDonough, 9 Casey, 73, as follows : " The remedies against a company provided by their Act of incorporation . . . . . do not exclude the common law remedies for injuries arising from an abuse of their privileges or for neglect of their duties."

Another question arose at the hearing of this case, upon which much argument was had, viz.: Whether or not the defendants are common carriers ? Common carriers are defined to be such as carry goods of all persons indifferently from

place to place for hire or reward: Gisbourn *v.* Hurst, 1 Salk., 249; Hale *v.* Navigation Co., 15 Conn., 539.; Fuller *v.* Bradley, 1 Casey, 121. The Susquehanna Boom Company does take charge of the logs of all parties indifferently for hire or reward, but does it carry from place to place? The structure known as the boom is several miles long; the river flows through it. The logs come into it at the upper end, and are delivered to the owners at or near the lower end, where the logs of the marks of each owner are rafted together. As the logs are taken out at the lower end of the boom those above float down or are floated down. If any logs lodge in the upper part of the boom, the boom company causes them to be dislodged and brought down to the place of delivery. If any carrying is done by the boom company it is done within their charter limits. This kind of carrying, if it may be so called, closely resembles that of a warehouseman carrying the goods entrusted to his care from one end of the warehouse where he receives them to the other end where he delivers them. The defendants' charter makes no mention of this carrying or transporting of the logs that come into the boom, and no compensation is fixed for such labor. In the case at bar the plaintiffs' logs were not lost whilst they were being carried or transported by the defendants. In Weld *v.* The proprietors of the side booms, Androscoggin river, 6 Me., 93, the only adjudicated case cited on this question, it was held that the boom company was only to be holden for losses occasioned by the want of ordinary care, attention and diligence, and not as common carriers.

In the view I have taken of the facts of this case, it is unnecessary to decide whether the defendants are common carriers, warehousemen or other bailees for hire.

At the argument of this case it was urged by the plaintiffs that defendants were guilty of negligence in not causing to be hung the Loyalsock boom, which was under their control, whereby most of the property of the plaintiffs might have been saved. Mill owners locate their mills on the streams and below the boom where the logs are to be caught, so that when the logs are rafted out they may be safely, easily and cheaply floated down stream to their mills. The plaintiffs' mill is located a mile or more below the lower end of the Susquehanna boom, The Loyalsock boom is a mile or more below the plaintiffs' mill. If plaintiffs' logs were caught in the Loyalsock boom they would, when rafted out, have to be brought up the river or taken into the canal at some point below, and thence towed up to the plaintiffs' mill. The plaintiffs' logs in 1867 and 1868, when put into the water, were destined for and were subsequently driven into the Sus-

quehanna boom. The plaintiffs had no desire to have their logs go to any other place, except that they preferred that they might be caught in the Loyalsock boom rather than be lost down the river. If plaintiffs desired their logs to pass the Susquehanna boom it was their duty to give notice to the defendants, as required by the seventh section of their charter. The Loyalsock boom is a boom* structure in the west branch of the Susquehanna river, located about three miles below the lower end of the Susquehanna boom. The two companies were consolidated by an Act of Assembly, entitled "An Act to consolidate the Susquehanna Boom Company and the Loyalsock Boom Company," approved 21st day of April, 1858. The effect of the consolidation was decided in Gould v. Langdon et al., 7 Wr., 365, where it was held, as follows:—

"Where separate statutes are passed authorizing the erection of a boom, they must be interpreted separately, though both become the property of one company; and an Act consolidating the two boom companies will not change the liability of either under its Act of incorporation to deliver logs at its own boom, the boom in which they were caught."

The important principle of law applicable to this case is this:—

Common carriers, and à fortiori other bailees for hire, are not responsible for the occurrence of an injury resulting directly from the "unavoidable dangers of the river" or "inevitable accident," provided it appear that they were guilty of no fault in falling into the danger, nor in their efforts to extricate themselves from it: Morrison v. Davis & Co., 8 Harris, 171, cited with approval in Railroad Co. v. Reeves, 10 Wall., 176; Hays v. Kennedy et al., 5 Wr., 378. Both these Pennsylvania cases are published as leading cases in this country in Redfield's Leading Am. Railway Cases, Vol. II., pp. 20 and 231.

After a careful consideration of the law and facts of this case, I arrive at the following conclusions:—

1. That the court has jurisdiction of the plaintiffs' case in this form of action.

2. I find that in the years 1867 and 1868, after plaintiffs' logs were delivered into defendants' boom, large quantities escaped therefrom each year, and were wholly lost to the plaintiffs.

3. I find that the plaintiffs' logs, for the loss of which they bring this suit, were lost directly by the "unavoidable dangers of the river" or "inevitable accident" incident to the booming of logs in the west branch of the Susquehanna river under the defendants' charter.

4. I find that in respect to the plaintiffs' logs, for the loss of

which this suit is brought, the defendants were not guilty of any fault, negligence or want of care either before, at the time of, or after the accidents happened whereby the losses occurred.

5. All the points submitted by counsel are affirmed so far as they are consistent with the foregoing conclusions, and so far as they are inconsistent therewith, or rendered unnecessary of decision thereby, they are refused.

6. I find in favor of the defendants.

And now, December 31st, 1883, it is ordered that notice be given of the filing of this decision, and that judgment be entered in accordance therewith in favor of the defendants and against the plaintiffs, unless exceptions are filed, *sec. reg.*

The plaintiffs filed exceptions to the decision (twenty-five in number) covering the findings of fact and conclusions of law, some of which the court sustained, but most of which were overruled. In the opinion of the court on the exceptions, however, the court said:—

" The action of the court on the exceptions filed requires no change in the six specific findings or conclusions of the court, and it is therefore ordered that judgment be entered thereon in favor of the defendants and against the plaintiffs."

The plaintiffs took this writ of error, assigning for error, in substance, the refusal of the court to sustain their exceptions, and the above judgment.

*Wm. H. Armstrong*, *R. P. Allen* and *Samuel Linn*, for the plaintiffs in error.—The defendant company is liable under its charter for the logs lost out of the boom in 1867 and 1868, without proof of negligence. The company, in accepting the charter took it *cum onere;* and it is not only a contract, but also a law imposing upon the defendants as a corporation the burden of performing a certain duty to the public: Penna. & Ohio Canal Co. *v.* Graham, 13 P. F. S. 290 ; Penna. R. R. Co. *v.* Commonwealth, 3 Grant, 129 ; Riddle *v.* Proprietors of Locks and Canals on Merrimac River, 7 Massachusetts, 169 ; Head *v.* Providence Insurance Co.. 2 Cranch, 137 ; Bank *v.* Dandridge, 12 Wheaton, 64 ; Bank *v.* Earle, 13 Peters, 587 ; Perrine *v.* Canal Co., 9 Howard, 184 ; Fowler *v.* Scully, 22 P. F. S. 456. The defendants were negligent, because in 1867 and 1868 their booms were not sufficiently strong, nor of sufficient capacity to secure the quantity of logs which they knew, or had the means of knowing, they would be required to hold during those years respectively ; and being so negligent they are liable to the plaintiffs.

The defendants were negligent because they did not hang their lower boom, which belonged to the Loyalsock Boom Com-

pany. Had they done so, as they were requested and notified to do, the logs would not have been lost. Under the enormous powers that the company had in controlling the logs which passed into their boom, this was gross negligence, and the defendants are liable: Phila. & Reading R. R. Co. v. Derby, 14 Howard, 468; Wabash Railway Company v. McDaniels, 107 U. S. 454; Schouler's Bailments, 399, etc. The defendants are liable to the plaintiffs because they did not observe the proper care to secure the logs of the plaintiffs in 1867 and 1868, required by the common law rule of diligence on the part of such bailee: Railway Co. v. McDaniels, *supra;* Railroad v. Swift, 12 Wallace, 262; Beckman *et al. v.* Shouse, 5 Rawle, 189; Verner v. Sweitzer, 8 Casey, 208; Farnham v. Railroad Co., 5 P. F. S. 59; Hays v. Millar, 27 Id., 238.

The defendant was bound to provide against all states of the river, except an extraordinary flood, and the very facts found by the court below show that there was nothing in the circumstances of this case to excuse the company from the loss of the logs in 1867 and 1868; both a "spew" and an "overflow," which were the cause of these losses being avoidable by an observance on the part of the company defendant of the specifications of the structure described in their charter, which they were to construct, and at all times keep and maintain in the river sufficiently strong to secure all the lumber contained therein.

*B. S. Bentley, H. C. Parsons,* and *H. C. McCormick,* for defendants in error.—Findings of fact by the court below have the same conclusion and binding force as the verdict of a jury, and such findings of fact are not assignable for error if there was evidence to have submitted to a jury: Kerr v. Ames, 39 Leg. Int., 392; Phila. v. Linnard, 1 Out., 250; Griffith v. Sitgreaves, 9 Norris, 161; Jamison v. Collins, 2 Id., 359; Lee v. Keys, 7 Id., 175; Brown v. Dempsey, 14 Id., 243; Camden and Phila. Steamboat Co. v. Monaghan, 10 W. N. C., 46.

The charter of the defendant company is, so to speak, but a re-enactment of the common law liability of bailees for hire, and the duty of the company under it is no more than to use ordinary diligence in the care and preservation of the property intrusted to them: 1 Smith's Leading Cases, 300; 2 Chitty on Pleading, 334; 2 Id., 352; Ross v. Hill, 52 Eng. Common Law Rep., 877; Huntsville Bank v. Hill, 1 Stewart, 201 (18 Am. Dec. 39); Penna. Canal Co. v. Burd, 9 Norris, 284.

In actions for negligence the burden of proof is on the plaintiff, the law will not presume it for him; and in this case the plaintiffs have failed to prove it before the lower court: R. R.

Co. *v.* Fries, 6 Norris, 234; Phila., Wilm. and Balt. R. R. Co. *v.* Stinger, 28 P. F. S., 225; R. R. Co. *v.* Killips, 7 Norris, 405; Adams Express Co. *v.* Sharpless & Sons, 27 P. F. S., 522; Baker *v.* Fehr, 1 Out., 70; McCully *v.* Clarke *et al.*, 4 Wr., 399; Albert *et al. v.* N. C. R. R. Co., 2 Out., 316; Farnham *v.* Camden and Amboy R. R. Co., 5 P. F. S., 61; Story on Bailment, § 410.

The defendant company was liable at common law and under their charter, only for those consequences which may have arisen from the neglect to make provision for those dangers which ordinary skill and foresight is bound to anticipate: Morrison *v.* Davis & Co., 8 Harris, 171; R. R. Co. *v.* Reeves, 10 Wallace, 176; Hays *v.* Kennedy *et al.*, 5 Wr. 378; Humphreys *v.* Reed, 6 Wh., 435; The Morning Light, 2 Wallace, 550; Union S. S. Co. *v.* N. Y. & V. S. S. Co, 24 How. 313.

The rate charged by a carrier shall be proportionate to the risk and responsibility incurred. But the Boom Company is restricted as to the rates it can charge by section 6 of its charter: Gordon *v.* Little, 8 S. & R. 558.

Mr. Justice CLARK delivered the opinion of the court October 5th, 1885.

The Susquehanna Boom Company is a corporation, originally created and existing by virtue of an Act of Assembly, approved 26th March, 1846. Its franchise originally extended up the Susquehanna river from the western boundary of the city of Williamsport, a distance of seven miles; but its limits were afterwards extended by Act of Assembly, approved 28th April, 1864, fifteen miles further up the stream. The Loyalsock Boom Company was created by Act of Assembly, approved 11th April, 1848, and its franchise extended from the western boundary of the city, down the river, a distance of sixteen miles, to the Muncy dam. By the Act of 21st April, 1858, the companies were consolidated under the name of the Susquehanna Boom Co., " with all the rights, privileges, and immunities, and subject to all the restrictions," contained in their respective charters. The powers conferred and duties imposed upon the respective companies, as set forth in their respective charters, were, " to erect and maintain on the west branch of the river Susquehanna, between the borough of Williamsport and the mouth of Quineshoque creek, such boom or booms with piers, as may be necessary for the purpose of stopping and securing logs, masts, spars, and other lumber, floating upon said river, and erect such piers, side, branch or sheer booms, as may be necessary for that purpose." "And the said corporation shall construct, and at all times keep and maintain, their piers and booms sufficiently strong to secure all the

lumber contained therein; but no person shall be allowed at any time to encumber said booms with rafts, either of logs or other lumber."

The plaintiffs were the owners of an extensive saw mill property in the city of Williamsport. In the year 1867, and also in 1868, large quantities of their logs, which they had driven down the river into the Susquehanna boom, to stock their mills, escaped, and were wholly lost; and this action was brought to recover damages for the injuries thus sustained.

On the 29th September, 1880, the parties, by agreement in writing, waived a trial by jury and submitted the decision of the case to the court, under the Act of 22d April, 1874, the questions now presented for our consideration arise, upon exceptions filed to the decision of the court, under the provision of that Act.

There was some dispute as to the precise manner in which these several losses occurred, but the facts are found and particularly stated by the court as follows:—"If the logs come into the boom on such low water that they will not pack but remain on the surface of the water, the boom will not hold one half as many logs, and will soon fill up to its head. If, then, there should be a slight rise in the river, or if for any other cause this vast body of logs should surge down, as they will do, some logs may be forced on top of the boom platforms and cause them to sink under the water, thus making an outlet whereby the great pressure is relieved. The boom platform being thus sunken, the logs are forced out of the boom at this point, soon a channel is thus made and a large quantity of logs will surely escape. This is called a 'spew' of logs. It is impossible to prevent this accident. No man can tell when or where it will occur, and the strength or weakness of the boom structure has nothing to do with its occurence. No part of the boom structure is broken by this accident. This is the kind of accident which occurred when the plaintiffs' logs were lost in 1867, for which they bring their action."

"If the logs come into the boom on such low water that they will not pack but remain on the surface of the water, the boom will not hold one half as many logs and will soon fill up to its head. If then no rise in the water or other thing occurs to cause the logs to surge down in the boom, it is certain and inevitable that all logs coming down after the boom is full must go by the boom and be lost. This is called an 'overflow' of logs. This was the situation immediately before the accident happened when the plaintiffs logs were lost in 1868."

The plaintiffs contend, in the first place, that the Susque-

hanna Boom Co. is liable to them for the value of the logs lost in 1867 and 1868, without any proof of negligence; that by the express terms of the charter the company was held "to construct its piers and booms sufficiently strong to secure all the lumber contained therein," and that as the powers and privileges conferred were in derogation of common right, were exclusive, and for personal profit, the liability for losses must be according to the strictest import of the statute. They therefore treat the words of the statute as imposing upon the company a responsibility which is absolute and unlimited— the responsibility of an insurer against all risks of whatsoever kind or character. It will be seen, however, that the responsibility of the company is not expressed in the statute; the liability for losses is but an implication of law from the failure to perform, after the acceptance of the charter, what the charter requires. In the ascertainment of the extent of that liability, therefore, we are remitted to the consideration of what is really required. What, therefore, under a fair construction of the charter, was the company bound to do?

It is doubtless true that such charters are to be construed most beneficially for the public, and more strictly against the company, but the construction must be a reasonable one. The charters of most private corporations are for purposes of private gain and many of them grant exclusive privileges in abridgement of individual right, but as they are intended also to subserve great public interests they should be so construed as not to defeat the purpose of their creation. The Susquehanna Boom Company was not only intended to serve the private interest of the corporators, but also that of the public, and especially of those who with rafts, logs, or lumber should navigate the stream; it proposed to do for them what they could in no way do for themselves. Whilst, therefore, the words of the charter should be construed with some degree of strictness for the public protection, it should not be construed to require the performance of what, in the nature of the case, cannot be performed. By the words of the charter the company was required to "construct its piers and booms sufficiently strong to secure all the lumber contained therein." If this is to be understood in any absolute sense, it required the performance of an admitted impossibility; it was impossible, of course, to construct a boom which, at all times and under all circumstances, would hold all the lumber contained therein. We are informed, by the finding of the court, that if the logs come into the boom, on very high water as in the flood of 1865, no boom structure will hold them; and if they come in on a low water "spews" and "overflows" are inevitable accidents, which it is impossible at times to prevent. Did the legisla-

ture, in the passage of this Act, intend to do an absurd and unreasonable thing? It was certainly not supposed that the corporators could overcome the power of Nature, or build a boom which would stand sufficient and secure against all the casualties that might occur; the language of the charter must be taken in a sense, restricted by reason and common experience. Such a construction of the statute does not, we think, involve any interpolation of words into it; it accords with the general understanding of the language actually employed. A vessel sufficiently strong to secure its cargo may in a moment be dashed to pieces in a storm; a house built upon the solid rock sufficient and secure, may be utterly demolished, even in a slight tremor of the earth, and a boom, in all respects sufficiently strong to secure all the lumber contained therein, may be swept away by the inevitable power of the flood.

But the defendants are held to the exercise of more than ordinary diligence and care in the discharge of the obligations imposed. They may not, perhaps be held to do what, in the very nature of the case, cannot be done, but they may certainly obligate themselves to do what can be done; this is the exact measure of duty which the company assumed by acceptance of the charter. They are therefore liable for all losses which may have occurred from any insufficiency of their boom, whether from negligence or not, unless that insufficiency arose from the unavoidable dangers of the river, or from inevitable accident. The case does not present a question of negligence, but a question of performance. The defendants are not merely bailees for hire, and bound under the rule of the common law to ordinary care only; they are bound to do what it was their self-imposed duty to do, unless by the act of God they were prevented. We agree with the plaintiffs, therefore, first, that the degree of care which the company was bound to exercise to secure the logs in their boom is fixed by the charter; and, second, that in the event of a loss, the company is liable, under the charter, without proof of negligence. This is the precise doctrine declared in Penna. & Ohio Canal Co. *v.* Graham, 13 P. F. S., 290, where the authorities are fully collected, and carefully considered, by the late Justice SHARSWOOD: In that case, a canal company, by its charter, was required to build, and keep in repair, bridges at all points where the canal crossed a public road. A traveller was passing over one of these bridges, when it gave way, and he was precipitated with his wagon into the canal; in an action for damages, for the injuries sustained, it was held that the charter is a law imposing on the company the burden of performing a duty to the public, and if that duty

be not performed the company is responsible to those who thereby suffer special injury; and, further, that a corporation, bound in consideration of its franchise, to keep a road or bridge in repair, is liable for injury from want of repair, whether the defect be patent or latent, unless the party injured be himself in default, or the defect was from inevitable accident, tempest or lightning, or the wrongful act of a third person, of which the corporation had no notice; and this, although ordinary care was used in the erection or repair, and the work was done by competent workmen under contract. At this point, however, we are confronted with the following clear, comprehensive and conclusive findings of the learned court below:—

"I find that the plaintiffs' logs, for the loss of which they bring this suit, were lost directly by the 'unavoidable dangers of the river' or 'inevitable accident' incident to the booming of logs in the West Branch of the Susquehanna river under the defendant's charter."

"I find that in respect to the plaintiffs' logs, for the loss of which this suit is brought, the defendants were not guilty of any fault, negligence or want of care either before, at the time of, or after the accidents happened whereby the losses occurred."

These findings, in our opinion, are fatal to the plaintiff's recovery in this case. It is well settled, by the decisions of this court, that in a case tried by the court, under the Act of 1874, a writ of error only brings up questions of law. This court cannot go behind the findings of fact, as they appear in the record. The judge, in such cases, exercises the double function of court and jury, and we are to dispose of the case here, precisely as if the facts had been found by a jury; if there was evidence of the fact, the finding cannot be impeached. It is useless, therefore, to assign for error mere matters of fact, unless the assignment is such as could be heard and determined, if the trial had been according to the course of the common law. The parties, by agreement, designated the tribunal for the determination of these disputed questions of fact, and they cannot now complain if the adjudication is adverse to their interests: Jamison *v.* Collins, 2 Norris, 359; Lee *v.* Keys, 7 Norris, 175; Brown *v.* Dempsey, 14 Norris, 243; Bradlee *v.* Whitney, 12 Out., 362.

If the losses resulted from the unavoidable dangers of the river, or from inevitable accident, incident to the business, and we are bound to assume that they did; if the defendants were not guilty of any fault, negligence, or want of care, either before, at the time, or after the accident happened, whereby the losses occurred, and this we are also bound to assume, then

it matters not whether the defendants be treated as bailees for hire, as common carriers, or, as bound by the special provisions of their charter; in any case, they are relieved from responsibility for the injuries sustained.

It has been urged very strongly in the argument that it was the duty of the Susquehanna Boom Company, under their charter, to have their lower boom, the Loyalsock, hung, and in proper condition, to stop and hold the logs, at the time of the losses in 1867 and 1868. In the 16th point submitted by the plaintiffs, the court was requested to find as follows:—

" That if the lower boom had been properly and in due time hung with its sheer, and had been guarded and cared for with due diligence, before and at the time of the breaking of the upper boom in 1867, as hereinbefore stated, it would have been sufficient to catch and secure all the logs which escaped through the breach of the upper boom at that time, and have prevented the loss of which the plaintiffs complain."

The 17th point was to the same effect, excepting that it related to the loss of 1868. The court found that neither of these points was sustained by the evidence. Now, whatever may have been the defendants' duty, if the Loyalsock boom had been found to have been available and sufficient, to prevent the loss, it must be admitted, that in view of this finding, the question is one of little importance. For of what avail would it be to oblige the performance of that which could serve no useful purpose? If the hanging of the sheer and the guarding of the Loyalsock boom would not have secured the logs, upon what principle of law or of common sense would the defendants have been obliged to undertake that work? But, assuming the sufficiency of the Loyalsock boom to save the loss, was it the duty of the company to hang the sheer and guard that boom to save logs consigned to, but escaping from, the Susquehanna boom, by unavoidable and inevitable accident? The Loyalsock was not a mere appendage or appurtenance of the Susquehanna boom, nor was it designed or used to take logs escaping from that boom; it was erected and maintained as a separate and distinct boom, to take and secure logs consigned to it, as a supply to the mills below. Mills are so located, with reference to the boom, that the logs, when rafted out, may be floated with the current. The plaintiffs' logs were destined for, and were actually driven into, the Susquehanna boom, which was a mile or more above their mills, whilst the Loyalsock was a mile or more below. The plaintiffs had no desire to have their logs in the Loyalsock; if they had desired them to pass the Susquehanna boom, it was their duty to give notice as required by the seventh section of their charter; they preferred, however, perhaps, that they might be

caught there, rather than lost. If there had been no consolidation there could be no question. But the effect of the consolidation was to unite the companies only, not the booms; the consolidated company controlled each of them separately, "under the rights, privileges and immunities," and "subject to the restrictious, contained in the respective charters," some provisions of which were not common to both. In Gould *v.* Langdon, 7 Wright, 365, the effect of the consolidation was considered by this court, and it was held that these separate statutes "must be interpreted separately, although both become the property of one company, and an Act consolidating the two boom companies will not change the liability of either, under its Act of incorporation, to deliver logs at its own boom, the boom in which they were caught." The duty of the defendants is discharged, if their booms are sufficiently strong, as required by the statute. They are bound to secure the logs destined for and driven into their respective booms, and for their failure so to do they are to be held rigidly responsible; but they are not bound when the structure is destroyed by the act of God, to pursue and capture the lumber upon the flood, under penalty of being held responsible for the loss of what might possibly have been recovered in the pursuit.

The judgment is affirmed.

Mr. Justice GORDON dissented.

January 11th, 1886. PER CURIAM. Motion for a re-argument refused.