# WEST BR. BOOM CO. v. PENN. JOINT L. & L. CO.

ERROR TO THE COURT OF COMMON PLEAS OF LYCOMING COUNTY.

Argued March 12, 1888—Decided October 1, 1888.

1. When matters in a proviso to the charter of a private corporation are made and intended to be essential conditions of the enjoyment of the charter, the privileges granted must be enjoyed subject to the conditions, or not enjoyed at all : Dugan v. Bridge Co., 27 Pa. 309.
2. But where in the charter of a private corporation the commonwealth has granted a public franchise, a clause merely relative to the manner in which such franchise shall be exercised, will not be so construed as to defeat the purpose of the grant : Whitaker v. Canal Co., 87 Pa. 34.
3. The provisos to §§ 3 and 7, act of March 29, 1849, P. L. 245, relative to the manner of constructing the booms and the stopping of rafts and logs, with reference to the free passage and unobstructed navigation of the river, etc., shall not be so construed as to forbid the temporary detention of logs, marked and intended to be driven below the boom, under circumstances in which it would not be reasonably possible to separate and pass them.
4. Wherefore, such temporary detention not being ultra vires the boom company, for whatever injuries that are caused to the owner or owners

of logs thereby, the special remedy for the ascertainment of the damages by the award of disinterested freeholders, provided by § 3 of the act, must be pursued : Bald Eagle Boom Co. v. Sanderson, 81* Pa. 402.

5. Brown v. Susquehanna Co., 109 Pa. 68 ; Whitaker v. Canal Co., 87 Pa. 34 ; Monongahela Bridge Co. v. Kirk, 46 Pa. 112 ; Commonwealth v. Railroad Co., 27 Pa. 365 ; Susquehanna Boom Co. v. West Branch Boom Co., unreported, followed ; West Br. Boom Co. v. Dodge, 31 Pa. 285, defectively reported.

Before GORDON, C. J., PAXSON, STERRETT, CLARK and WILLIAMS, JJ.; TRUNKEY and GREEN, JJ., absent.

No. 89 January Term 1887, Sup. Ct.; court below, No. 538 March Term 1885, C. P.

On January 12, 1885, a summons in case was issued by The Pennsylvania Joint Lumber & Land Co. against The West Branch Boom Co., to recover damages for the detention of logs in the boom of the defendants and for the resulting deterioration in their value. The defendants pleaded, not guilty.

The plaintiffs owned and operated a saw-mill at Williamsport, twenty two miles below the defendants' boom at Lock Haven, and also owned and operated extensive timber lands at the head waters of the West Branch of the Susquehanna, upon which river the defendants' boom was constructed. The defendant company was incorporated by the act of March 29, 1849, P. L. 245, followed by the supplementary act of May 8, 1854, P. L. 666.

At the trial on October 4, 1886, the plaintiffs showed in substance that on January 30, 1883, and on the same date in 1884, they had given notices to the defendant company, as provided by § 7 of the incorporating act, that they required them to pass through their boom logs with certain marks upon them which would be put into the river the springs following the notices ; that the logs were put into the river as notices had been given, and should have reached the boom of the Susquehanna Boom Co., at Williamsport, on the spring floods, but they were detained in the boom of the defendant company, causing loss by the delay and deterioration, which was reckoned in damages. The plaintiffs then rested.

The defendants then made the following offers :

Defendants' counsel now propose to prove by this and other witnesses, that shortly after the West Branch Boom Company was incorporated, a company was regularly organized and proceeded to erect and construct in the West Branch of the Susquehanna river, at and above the city of Lock Haven a boom with cribs and piers, in the usual and ordinary manner in which booms are constructed upon the West Branch of the Susquehanna river, for the purpose of catching logs; that that boom has been regularly maintained from the year 1850 to the present time; that the length of the boom is about one mile, and its capacity is from twenty-five to thirty millions of feet of lumber in an ordinary flood.

That in the year 1883 there were five saw mills in Lock Haven, the owners of which received logs from the West Branch Boom; that their logs were put in the river above the boom and were driven into the boom on the early spring flood of that year; that during the first flood in 1883 a very large amount of logs were put into the West Branch of the Susquehanna river and its tributaries, part destined for the West Branch Boom, to supply the saw mills of Lock Haven, but by far the larger part destined for the Susquehanna Boom at Williamsport, about twenty-two miles below the West Branch Boom; that these logs, destined both for Williamsport and Lock Haven, were thrown indiscriminately into the river at different points on the small streams and on the main river; that they were marked with several hundred different kinds of marks, some of which were letters, some figures, and some emblems of various kinds, all the marks being on the ends of the logs; that when these logs came into the West Branch Boom they completely covered the surface of the water, and filled up the West Branch Boom, partly with logs destined to Lock Haven and partly with logs destined to the Susquehanna Boom at Williamsport; that this flood was late in February or early in March, 1883, and the West Branch Boom Company proceeded at once and put on a large force of men for the purpose of rafting out the logs intended for the Susquehanna Boom at Williamsport; that they employed from sixty to eighty men, and worked always ten hours a day, and sometimes at night and sometimes on Sundays, for the purpose of delivering the logs at Williamsport, below the

West Branch Boom; that all the logs were rafted out of said boom on March 31, 1883; that shortly after another flood came and the boom was again filled, and on April 21st, the West Branch Boom Company commenced with the same force, and with the same activity, to raft out those logs, and that they finished rafting and cleaned out the boom on May 19th; that subsequently another flood came and filled or partly filled the boom, and the boom company proceeded to raft out those logs in the same manner, and cleaned the boom entirely of logs on August 11, 1883. That subsequently, or immediately after the boom was emptied, another small flood came, and the boom company proceeded in the same manner, and cleaned out the boom on September 6, 1883; that all the logs destined for the Susquehanna Boom at Williamsport were delivered into the river below the works of the West Branch Boom Company prior to September 8, 1883.

That in the year 1884 another very large amount of logs were placed in the West Branch of the Susquehanna river, above the boom of the West Branch Boom Company, comprising an equal number of marks and as large a quantity of logs as the year before, and driven in the same way, and filling the boom as it had been filled in the year 1883; that the Boom Company defendant immediately commenced with the same force of men, working the same number of hours, to raft out the logs and deliver those destined to Lock Haven to the owners there, and those destined to Williamsport into the river below the boom; that they finished and cleaned out the boom on April 26, 1884; that another flood came early in June of that year, and the defendants commenced on June 7th, with the same force, and cleaned out the boom and delivered all the logs destined for the Susquehanna Boom, and finished delivering all the logs intended for the Susquehanna Boom on August 21, 1884.

That this boom of the West Branch Boom Company is constructed of wooden piers filled with stone, connected by sticks of square timber extending up the river, and at its end a shear boom projects from the northern shore. That the river is narrow at the upper end of the boom and for some distance above it, and the logs run into the boom in large quantities, and it is an actual and physical impossibility to deliver the logs be-

low the boom faster than they were delivered by the defendants in the years 1883 and 1884; that the defendants used every appliance and means, expended large sums of money, employed a great many men and did everything in their power that it was possible to do by human ingenuity and skill to deliver the logs of the plaintiffs below the boom, so that they could be driven into the Susquehanna Boom; that the marks of the logs are invariably upon the end, and it is impossible to ascertain to whom those logs belong until the mark can be seen, and that can only be done when the boom is opened and the logs passed out; that it is impossible to open the boom on a high stage of water, because all the logs, both those destined for Williamsport and those intended for Lock Haven, would go out together, and no human power could stop them; that the only delay in the years 1883 and 1884 arose in waiting for the water to subside so as to enable the men to work on the boom.

This for the purpose of showing: (1) That under the charter of the West Branch Boom Company, it had a right to erect and maintain its boom in the West Branch of the Susquehanna river at Lock Haven, in the county of Clinton. (2) That it did not detain the logs of the plaintiffs in either of the two years, but delivered them below its boom as rapidly as it was possible to deliver them. (3) That the defendants, having a right to erect and maintain their boom, and the plaintiffs having delivered their logs into the river with the knowledge of the boom structure at Lock Haven, were bound to take all their logs as soon as they were delivered below the boom of the West Branch Boom Company and do as they pleased with them, and they cannot make the defendants liable for any delay occasioned by the action of the river.

Plaintiffs' counsel object:

(1.) Because the defendant company is required by law to stop no logs destined to Williamsport, and it is no excuse in this suit, that having stopped them the defendants used their best efforts to turn them loose. The act being in violation of law, the defendants are responsible in damages occasioned by the detention, without regard to the skill or diligence employed to sort the logs; nor is it any difference that the boom structure is erected as other boom structures are, it being only lawful for them to stop such logs as are destined for Lock

Haven.   (2.)  Because as to the owners of logs designed to be driven below the boom at Lock Haven, as in the case at bar, the defendants are bound to see that the passage of the logs is not obstructed by the boom, and the company is not justified in stopping by their boom any lumber excepting rafts designed to be stopped there.   (3.)  Because there is no offer on the part of the defendants to show that the logs of the plaintiffs were not detained, as averred and proven in this case, the substance of the offer being merely to excuse an unlawful act. (4.)  Because, as to all logs destined for points below Lock Haven, the erection of the West Branch boom structure in the West Branch of the Susquehanna river is an unauthorized and illegal obstruction, and as to all owners, excepting those desiring their logs to be stopped at Lock Haven, a public nuisance.   (5.)  Because the evidence is impertinent, irrelevant and immaterial to the issue trying.

By the court: The objections, except the fourth, are sustained and the evidence excluded.[1]

Defendants' counsel now offer to prove by this and other witnesses that in the years 1883 and 1884, there were cut and put in the West Branch of the Susquehanna river, in each year more than two hundred millions feet of saw logs above the city of Lock Haven and above the West Branch boom; that these logs were intended partly for Lock Haven and partly for Williamsport; that the owners of the saw mills at Lock Haven received their logs from the West Branch Boom Company, and those at Williamsport from the Susquehanna Boom Company; that these logs came in together upon the floods each year; that they filled up the boom of the West Branch Boom Company, and it was impossible to separate the logs and deliver those intended for Lock Haven and those intended for the mills below, any faster than they were delivered in the years 1883-4.   That the said logs were not detained in the West Branch boom by any act of the boom company except by closing their boom, and the logs ran into the boom by the power of the water.   This for the purpose of showing that the logs were not detained, but were all passed through the boom as fast as it was possible to pass them.

Counsel for the plaintiffs object to the offer, and recite the first three objections to the last preceding offer, and object,

(4.) because the offer itself admits a detention of these logs by the closing of the boom at Lock Haven.  (5.) Because the evidence is impertinent, irrelevant and immaterial.

By the court: The objections are sustained, and the evidence excluded.[2]

Defendants' counsel now propose to prove by this and other witnesses that the franchises granted by the legislature to the West Branch Boom Company, by the act of incorporation, can be exercised in no other way and in no other manner than they have been exercised since the year 1850 and up to the present time, as proposed to be proved by the two offers already excluded.

Counsel for the plaintiffs object for all the reasons stated to the last preceding offer, and recite them here.

By the court: The objections are sustained, the evidence excluded.[3]

The case was then closed on the evidence, when the court, CUMMIN, P. J., charged the jury and answered the points presented as follows:

The plaintiffs are the owners of extensive tracts of timber lands upon the head waters of the West Branch of the Susquehanna river.  They own and operate a mill in this city. Their business is carried on by cutting this timber in the woods, putting their marks upon it and then casting it into the streams in the spring, and it comes down on the floods in the river.  The plaintiffs allege that, while they did this in 1883–4, and put in very large quantities of logs each year, when these logs came to near Lock Haven, where the West Branch Boom Company have a structure in the river, they closed their boom and caught a large quantity of them, not only once but at different times during the year, and thus detained them on their passage down the river; and that the plaintiffs had given the notice required by law each year, as follows: [Court here reads notice]: that this continued to such an extent, that when it came to the fall of the year there still remained back a large quantity of their logs which had been caught in this boom, and they were obliged to expend large sums of money in bringing them down; all their other logs on the same drive having come through except these that were detained; that they commenced to bring their logs

down, but did not succeed in getting them in their harbors until Thanksgiving Day of each year, both dates being after the sawing season, and that they were therefore required to keep them over winter. They claim here that if the defendants had not detained these logs they would not have suffered damage. They say that in 1883 they were compelled to bring these logs down, and that to drive them down from Lock Haven it cost $1,112.70, which was one dollar per thousand on 1,112,706 feet. In 1884 they were required to bring down the same way 791,603 feet, but that year had to pay but forty-five cents per thousand, amounting to $356.22. They claim here that by reason of this delay these logs did not come into their actual possession until after the sawing season. By reason of that they lost a considerable quantity of this lumber; by being exposed to the weather that length of time the sap was lost in the measurement of the lumber. This is put by some of the witnesses at such a per cent; some at two dollars per thousand. I think one witness, said one and one half to two dollars a thousand. Others put it at so much per cent, amounting to about the same.

The defence set up in this action is that these defendants had a right to stop these logs, and their duty was to turn them through the boom as rapidly as they could do it. They offered to show this, and to show that there was no negligence, [but, as you may remember what was said at the time the motion was made when the plaintiffs closed their case, this court is of the opinion that we are bound by the decision of the Supreme Court in the case of West Br. Boom Co. v. Dodge, 31 Pa. 285, and in this case our present step is taken relying solely upon that decision. It is of no importance what our views may be about this charter. The decision is binding upon the court and jury, and so we receive it, as we have no power to review the decisions of the Supreme Court. We accept that as the law and go by it. And so we are of opinion that the defence was not valid, because it was held in that case that they had no right to stop the logs at all, and that is the point on which the plaintiffs claim in this case. For, under their charter, they are bound to allow a free passage to all logs destined below their boom and to stop none except those destined and intended to be stopped at that place. That is the

view we have taken. There is no other defence except the one which I have stated. It leaves nothing then but the amount for you to ascertain that these plaintiffs are entitled to recover].[3] . . . . .

Defendants' counsel request the court to charge the jury:

1. That the said defendants having been incorporated by an act of the general assembly of this commonwealth, approved March 29, 1849, and its supplements, and by said act having been authorized to erect a boom at Lock Haven, said charter should be so construed as to best effectuate the intention of the legislature, though such construction may seem contrary to the letter.

Answer: Affirmed. I must presume that the Supreme Court had that in view when they ruled the former case.[4]

2. That by the terms of the said charter the said boom company was authorized to erect a boom at Lock Haven of cribs and piers and shear booms, and they did so erect said boom, and if the logs of the plaintiffs came into the boom so erected by legislative authority, they cannot recover by merely proving that they were detained in said boom, but they must show some negligence or omission or misuse of power by the boom company, and having failed to show either in this case the plaintiffs cannot recover.

Answer: That point is refused.[5]

3. That the charter of the company defendant provides, in § 3, that if any person or persons shall suffer damage by the exercise of the powers therein granted, the person aggrieved shall apply to the Court of Common Pleas of Clinton county, by petition, for the appointment of three disinterested freeholders to ascertain said damage; and, as this action is a common law action, it cannot be maintained, and the plaintiffs' only remedy is under the charter of the boom company.

Answer: That point is also refused.[6]

4. That under all the evidence in this case the verdict should be for the defendants.

Answer: That point is also refused. As I have said, there is but one thing for you to do, and that is to ascertain the amount which your verdict should be for the plaintiffs.[7] Take the figures I have given, and the injury to the logs, which if you compute at two dollars per thousand, would be $5,277.53, to which interest should be added.

The verdict of the jury was in favor of the plaintiffs for $4,950, upon which judgment was entered. The defendants then took this writ. The errors assigned were:

1–3. The refusal of defendants' offers.[1 to 3]

4–7. The answers to defendants' points.[1 to 7]

8. The part of the charge embraced in [ ][8]

*Mr. H. T. Harvey* and *Mr. Henry C. Parsons*, for the plaintiffs in error:

1. In the case at bar, there was neither averment nor proof of negligence. All that was alleged and all that was proved was, that the logs of the plaintiffs with thousands of others, came into defendants' boom, constructed by legislative authority; and, although the defendants offered to show that they were turned out as soon as it was physically possible to do so, their offer was rejected, and the jury were told in effect that as the logs had come into the boom, it was enough to render the defendants liable in damages. Such, we submit, is not the law. "Statutes are to be construed as best to effectuate the intention of the makers, which may sometimes be collected from the cause or occasion of passing the statute, and when discovered it ought to be followed with judgment and discretion in the construction, though that construction may seem contrary to the letter of the statute:" Mr. Justice TRUNKEY, in Improvement Co. v. Commonwealth, 94 Pa. 455. To the same effect are Commonwealth v. Fraim, 16 Pa. 169, and Howard Ass'n's App., 70 Pa. 346. Whitaker v. D. & H. Canal Co., 87 Pa. 34, in many respects resembles this case. The act upon which the canal company relied for its power to construct the dam, provided that the company should not make any improvements upon their works, "unless the same shall be so constructed as to leave the channel of said river as safe or convenient for the descent of rafts as it now is." This court said: "When the plaintiff avers that the defendants have constructed and maintained their dam in violation of their statutory rights, and in such manner as not to be the least obstructive to the navigation of the river, consistent with the use of the dam for the purpose of their franchise, and by some negligent act have caused him immediate injury, the burden is on him to prove his averments. The mere fact that the rafts were injured by the dam is not enough."

2. The proviso to the second section of the incorporating act was construed by Mr. Justice GORDON, in Susq. Boom Co. v. West Br. Boom Co., decided at Harrisburg, June 2, 1880, and unreported, wherein it was held that a literal construction of this provision utterly defeats the grant: " This, however, will not do, for a proviso in a grant for a public franchise cannot be allowed to defeat the grant itself." The opinion concludes : " The act has made ample provision for a free and unmolested navigation, and for the earliest possible transmission of lumber necessarily lodged within the booms ; and if in this or any other particular the defendant neglect or fail to perform its duty, it is answerable for any damages arising from such neglect or failure." This is exactly what we offered to prove, to wit : that every effort was made for the " earliest possible transmission of lumber necessarily lodged within the boom."

3. It is to be observed that there is no allegation of proof of negligence in this case ; therefore, the defendants' third point, to the effect that by the third section of the incorporating act the legislature had provided a specific mode by which damages were to be ascertained and determined, and that no other mode could be pursued. Section 2 of the act describes the powers of the company with minuteness. Immediately following this enumeration of their powers is § 3, prescribing a remedy if any person shall suffer damage by the exercise of the powers granted. That remedy is not a common law action. If in the exercise of their powers, they stop logs, and are in no way negligent in passing or securing them, why should not the remedy pointed out by the act of assembly be pursued ? No answer was given to the point but a simple negative, which was error : see Bald Eagle Boom Co. v. Sanderson, 81* Pa. 402 ; Act of March 21, 1806, 4 Sm. L. 332.

*Mr. H. C. McCormick* and *Mr. J. A. Beeber*, for the defendants in error :

I. Has the defendant company the legal right, under its charter, to stop and detain in its boom logs destined for Williamsport and other points below ?

1. By the supplementary act of May 8, 1854, P. L. 666, it was provided : that § 7, of the act of March 29, 1849, incor-

porating the company, should " be so construed that it shall be the duty of all persons desirous of driving logs below said boom, to give a written notice as required by said seventh section, otherwise the same may be stopped in said boom, notwithstanding the proviso in said section." The charter must be construed as a whole, and in such manner that all its provisions may be operative if possible. "No lumber of any description shall be stopped, except upon the written request of the owner or owners of the same, and no toll or expense shall accrue to any lumber designed to run or to be driven to any point below Lock Haven ; a free and unobstructed passage shall at all times be kept open, so that the navigation shall be free as it now is." The only change made by the act of 1854, is to require of persons a notice in the time provided by the seventh section, " otherwise the same may be stopped." The construction of the charter contended for by the defendants, would utterly abrogate the proviso. The defendant company is a private corporation, chartered to do a certain thing, and forbidden to do certain other things. That proviso is an absolute prohibition, as strong as language can make it, against stopping any logs intended for points below.

2. It is true, as a general proposition, that " a proviso or saving clause totally repugnant to the body of the act, is void," but this rule does not apply where such proviso is part of the act constituting a private corporation: in such case it is to be taken as an essential condition of the compact between the public and the corporation : Dugan v. Bridge Co., 27 Pa. 309 ; Flanagan v. Philadelphia, 42 Pa. 232; Clark v. Bridge Co., 41 Pa. 158; Monongahela Bridge Co. v. Kirk, 46 Pa. 130; McKeen v. Canal Co., 49 Pa. 434; C. & P. R. Co. v. Speer, 56 Pa. 334. But the charter of defendant company has already received an authoritative construction by this court, in a case wherein the issue tried was precisely the same as in the case at bar : West Br. Boom Co. v. Dodge, 31 Pa. 285. In that case, this court said : " It appears to us, therefore, that in its relation to the owners of lumber designed to be driven below the boom, the company is bound to see that its passage is not obstructed by their boom, and they are not justified in stopping any lumber, not of staved rafts, except what is designed to be stopped there." And in Susq. Boom Co. v. West Br.

Boom Co., unreported, cited by the defendants, this court, per Mr. Justice GORDON, said: "We think the proper construction of this act is fairly worked out in the case of West Br. Boom Co. v. Dodge, 31 Pa. 285," etc.

II. Was the remedy for this injury an action on the case, or by the specific method laid down in the third section of the charter?

1. By its charter and the supplement thereto, as well as by the construction given it in West Br. Boom Co. v. Dodge, 31 Pa. 287, the defendant company was authorized to erect booms for the purpose of stopping and securing lumber floating upon the river and not designed to be driven to points below said boom. No power or authority is given "to stop and secure logs" of owners who have mills below and design to drive their logs there to be sawed, if notice is given before March 1st, in each year as was done in the case at bar. Hence in stopping the logs of the plaintiffs the defendants were not exercising any power given by their charter, but were abusing their privileges and neglecting the performance of duties expressly commanded. For injuries received in such case, the appropriate and only legal remedy is at common law by an action on the case: Schuylkill Nav. Co. v. McDonough, 33 Pa. 73; Penn. & O. Canal Co. v. Graham, 63 Pa. 297; Fehr v. Schuylkill Nav. Co., 69 Pa. 169; White Deer Creek Imp. Co. v. Sassaman, 67 Pa. 415.

2. It is submitted that Bald Eagle Boom Co. v. Sanderson, 81* Pa. 402, does not convict us of error in this position. The company in that case was chartered to stop and secure logs and lumber floating on the creek. Its boom and all the attendant fixtures were but the means to this end, and hence if the company in the exercise of these powers cause any damage, the proceeding to assess the damages must be in the manner provided by its charter. All the authorities recognize the plain distinction, observed by the court below in holding that this defendant company was liable at common law for injuries caused by it when acting without authority of law.

OPINION, MR. JUSTICE CLARK:

By its charter the West Branch Boom Company was authorized to erect and maintain a boom on the south side of

the West Branch of the Susquehanna river near Lock Haven; and to this end, to construct such piers, side branches, or shear booms as might be necessary for stopping and securing logs or other lumber floating upon the river; and they are required at all times, to keep and maintain these piers and the booms sufficiently strong to secure all the lumber contained therein. The charter clearly contemplates the several distinct classes of lumber which, floating on the river, would come in contact with or be caught in the boom, and defines the duty of the company with respect to each:

First, it was provided that rafts of logs or other lumber might be landed and fastened as theretofore, and that any staved or broken raft coming into the boom should be delivered to the owner, upon payment of a certain price in the nature of salvage.

Second, that logs or other lumber might be driven into the boom for manufacture at Lock Haven, or to be formed into rafts and transported upon the water, in that form, to the place of their destination below Lock Haven. This would seem to have been the first and principal object in view in the construction of the boom, as it is provided in the charter as follows: "It shall be the duty of the corporation to cause the passage ways or open spaces to be carefully guarded day and night, so that no lumber be permitted to escape; to raft *all lumber* in said booms securely and faithfully, with suitable warps and wedges for rafting and securing the same below the said boom." The corporation had the right to charge and collect toll or boomage upon the lumber thus boomed, rafted and secured, including warps, wedges, etc., at rates in the 6th section specified.

Third, other logs and lumber rafted in above Lock Haven and destined for points below, and logs and other lumber not rafted, which were to be driven to their destination below Lock Haven. As to this there was a proviso or saving clause to the second section as follows: "Provided that said booms shall not extend more than half way across said river, and be so constructed as to admit the safe passage of rafts, boats, logs, masts, spars or other lumber, and not impede the navigation of said river and the branches thereof;" also a like proviso or saving clause to the 7th section as follows: "Provided at

all times, that no lumber of any description shall be stopped, except upon the written request of the owner or owners of the same, and no toll or expense shall accrue to any lumber designed to run, or to be driven, to any point below Lock Haven; a free and unobstructed passage shall at all times be kept open so that the navigation of the river shall be as free as it now is."

It is upon the proper construction of these saving clauses that the controversy arises. Plaintiffs' contention is, that as their logs were destined to points below the Lock Haven boom, and due and proper notice of that fact had been given as required by the act of May 8, 1854, P. L. 666, the defendants had no right to stop them, or to detain them, for any length of time in their boom, under any circumstances or for any purpose; and that, having done so in the years 1883 and 1884, they are answerable in damages for the loss occasioned thereby. The defendants maintain, however, that this construction of their charter would give it no practical effect whatever; that the several provisos mentioned, if so construed, are totally repugnant to the body of the act of incorporation and would wholly defeat the public purpose which the legislature manifestly had in view in its enactment. Their contention is, therefore, that the saving clauses should receive such a reasonable construction as would not practically nullify their charter. They offered to prove, in substance, that the plaintiffs' logs, for the detention of which damages are claimed in this suit, were thrown into the river, or some of its tributaries, in the winter or spring of 1883 and 1884, to be driven into the Susquehanna boom, 22 miles below the West Branch boom; that at or about the same time a very large amount of other logs, perhaps 200,000,000 feet or more, some destined for the West Branch boom, and some for the Susquehanna boom, were thrown into the same stream indiscriminately, and that, when the spring freshets came, the whole mass of logs was driven down the stream; that the swollen stream was filled with logs from bank to bank, and as the " drive " approached the West Branch boom, it was absolutely impossible to ascertain to which boom the logs were destined; that they could only be known by inspection of the marks on the ends of the logs, of which there were over 100 different kinds; that some of the

Opinion of the Court.

logs were in fact destined for Lock Haven, and some for Williamsport, but that the marks could not be seen nor their destination determined; that in order to secure the logs consigned to their custody, the West Branch Boom Company thereupon opened their boom, and received into it of the mass of the logs, without distinction, until their boom was filled, and suffered the residue to pass down the stream; that as soon as practicable, and with the utmost diligence and dispatch, they passed out of their boom all the plaintiffs' logs and all other logs destined for points below Lock Haven; that they used every appliance and means, expended large sums of money, employed a great many men, and did everything in their power, or that it was possible to do by human ingenuity and skill, to deliver the logs of the plaintiffs below their booms so that they could be driven into the Susquehanna boom; that the marks are on the ends of the logs and it is impossible to ascertain to whom the logs belong, until the marks can be seen, and that can only be done when the boom is opened and the logs passed out.

Was this testimony admissible? Under the circumstances stated in the offer, had the defendants a right to detain the plaintiffs' logs, until the marks upon them could be seen, and until they could be separated from logs which were consigned to their custody and care? Boom companies are organized to carry on, on a large scale, and under one management, the business of driving and rafting logs which would otherwise have to be done by individuals; they are intended to supply facilities for the driving of logs to the general public, and are therefore quasi public corporations: Osborn v. Boom Co., 32 Minn. 412; Cohn v. Boom Co., 47 Wis. 314. "It is doubtless true," as we said in Brown v. Susquehanna Boom Co., 109 Pa. 68, "that such charters ought to be construed most beneficially for the public, and more strictly against the company, but the construction must be a reasonable one. The charters of most private corporations are for the purpose of private gain, and many of them grant exclusive privileges in abridgment of individual right; but as they are intended also to subserve great public interests, they should be so construed as not to defeat the purpose of their creation. The Susquehanna Boom Company was not only intended to serve the private interests of the corporation, but also that of the public, and

especially of those who with rafts, logs or lumber, should navigate the stream: it purposed to do for them what they could in no way do for themselves. Whilst therefore, the words of the charter should be construed with some degree of strictness for the public protection, they should not be construed to require the performance of what, in the nature of the case, cannot be performed."

It is a general principle in the construction of statutes, that a proviso or saving clause, which is directly repugnant to the body of the act, will not have effect to defeat the purpose of the enactment. This principle it is true will not apply in the construction of the charters of private corporations, where the matters contained in the saving clause are made, and intended to be made, an essential condition of the enjoyment of the charter. If private corporations accept charters under such circumstances, they take them cum onere; they must enjoy their privileges subject to the conditions, or not enjoy them at all; Dugan v. Bridge Co., 27 Pa. 309. But, even in such case, we must first be satisfied what the condition really is, and in case of ambiguity or doubt, the intent of the legislature, in this respect, must be ascertained from a consideration of the whole instrument. In the case just cited, although the building of the bridge may necessarily have involved the erection of piers, yet it was not shown that these piers could not have been erected in such place and in such a manner as not to injure the navigation. Besides, the condition was plainly expressed; it involved no ambiguity or repugnancy, either in the words of the statute, or arising out of its practical operation.

In this case however, the manifest purpose of the legislature was to authorize the West Branch Boom Company to stop all lumber marked for their boom. The defendants allege that to do this and to comply with the provisions of the saving clause contained in the 2d and 7th sections, in any literal or strict sense, involves a practical and palpable absurdity, and that it is not probable the legislature intended the language of this proviso to be read in that sense. They contend that the saving clause to the 7th section, which provides that "No lumber of any description shall be stopped except upon the written request," etc., does not apply to the mere temporary detention of the logs, until the marks can be seen and their destination determined.

Private charters, as we have said, are to be strictly construed, but when the commonwealth grants a public franchise over a highway, a clause, relative to the manner in which such franchise shall be exercised, will not be construed so as to defeat the grant: Whitaker v. Del. & H. Canal Co., 87 Pa. 34. In the case cited, a corporation was authorized by its charter to construct a dam in a river, "provided that the same shall be so constructed as to leave the channel of said river as safe and convenient for the descent of rafts as it now is." "The plaintiff complains," says our late brother TRUNKEY, in the opinion of the court in that case, "that the river is not as safe and convenient for navigation as before the erection of the dam. Unquestionably this is so. A dam in a stream is an impediment, and in some degree renders its navigation less safe and convenient. A literal construction of this provision makes it impossible to build and maintain the dam, and the conceded right vanishes. . . . . Various statutes have been from time to time enacted authorizing public improvements, some of which would obstruct or impede the navigation of rivers, and others the use of streets and roads, which contained provisions forbidding such obstructions and impediments. The courts have uniformly held that these provisions should be liberally construed so as not to destroy the grant." In support of this principle are cited Monongahela Bridge Co. v. Kirk, 46 Pa. 112 and Commonwealth v. Erie & N. E. R. Co., 27 Pa. 365. In the former case the charter of the company provided, that nothing therein contained should authorize the erection of a bridge over the Monongahela river "in such manner as to injure, stop or interrupt the navigation of the river by boats, rafts or other vessels." It was held that the proviso was not intended to prevent the erection of piers in the bed of the river. Although piers in the bed of a navigable stream inevitably injure navigation and render it more difficult, they do not necessarily "injure, stop or interrupt the navigation" in the sense in which these words were used by the legislature. A strict, literal meaning was not intended, and in the very nature of the case it never could have been. When the purpose of the franchise is the performance of a public act, the grant is to be so interpreted as to enable the act to be done. "The general rule," says Mr. Justice READ, "undoubtedly is, that

charters of incorporation of private companies are to be construed strictly in favor of the commonwealth—so are grants to any persons—but they are to be construed reasonably. It is very clear that when the purpose of the franchise is the performance of a public act, the grant is to be interpreted so as to enable the act to be done. The act for the provision so made in this charter was a public one. It was the extension of one highway over another. Nor was the erection of the bridge less the performance of a public function, because the agent was empowered to exact tolls from passengers. The legislature is not to be supposed to have authorized and prohibited such a public act, at the same time and by the same charter; a grant of power to erect a public bridge is not to be construed so as to make its erection impossible, and such a construction justified by the rule that private charters are to be strictly interpreted." In the case of the Commonwealth v. E. & N. E. R. Co., 27 Pa. 365, the charter of the railroad company had a provision in it, that the railroad "should be so constructed as not to impede or obstruct the free use of any public road, street, lane or bridge now laid out, open or built." Chief Justice BLACK, in the opinion of the court rendered in that case, says: "And another objection to this location is more grave, because it bases itself on a provision in the act of incorporation. It is said that the streets would be less obstructed by taking the road down to the harbor, than by locating it where the defendants propose. The company is forbidden to make the road so as to obstruct or impede the free use of any street. These words taken literally and in their strongest sense, would prevent the railroad from being made on the streets at all. But we followed authority in saying they were not to be so interpreted."

But the rule of construction applicable here would seem to have been settled by the judgment of this court in the unreported case of the Susquehanna Boom Co. v. The West Branch Boom Co., argued at the January Term, 1877. The proviso to the 2d section, as we have said, provides " That the said booms shall not extend more than half way across the river and be so constructed as to admit the safe passage of rafts, boats, logs, masts, spars or other lumber, and not impede the navigation of said river and branches thereof." Whilst

the permanent portion of the boom structures was on the south side and did not extend more than half way across the stream, yet the company swung the shear from the north side of the river, and when the shear was closed the entire stream was for the time obstructed. The Susquehanna Boom Company thereupon filed a bill in equity in this court praying that the West Branch Boom Company might be enjoined from maintaining the shear; on full consideration, however, the bill was dismissed. Our brother GORDON in delivering the opinion of the court said: "Whether the defendant has the right to the use of the shear by which, at least occasionally and for a short time, logs intended for the Susquehanna boom must be stopped, depends altogether upon the powers conferred upon it by its charter; beyond this it cannot go; it must abide by what is written therein or what arises therefrom by necessary implication. . . . . . A literal construction of this proviso utterly defeats the grant, for as we have seen the boom without a shear, and that from the north side, is worthless; but more than this, if the boom itself must be so constructed as to allow the passage of boats, rafts and lumber through it, it is wholly worthless, since in that case it would hold nothing. This however, will not do, for a proviso in a grant for a public franchise cannot be allowed to defeat the grant itself: Whitaker v. Canal Co., 87 Pa. 34. . . . . . . . We are brought to the conclusion, which, after much examination and thought, we regard as inevitable, that the defendant had the right under its charter to maintain and use the shear which it did have and use at the time of the filing of this bill. Without such a structure the franchise itself is valueless; neither can the corporation answer the purposes of its creation nor perform the duties imposed upon it by the act of incorporation. It must therefore have its shear booms, and of course it must use them in accordance with the terms of the statute. The act has made ample provision for a free and unobstructed navigation, and for the earliest possible transmission of lumber *necessarily lodged within the booms*, and if in this or any other particular the defendant neglects or fails to perform its duty, it is answerable for any damages arising from such neglect or failure."

These cases show conclusively that we are not to adhere strictly to a literal construction of this charter, if by so doing

we defeat the public purpose to be subserved thereby; the provisos are to be construed so as not to defeat the grant itself. The swinging of the boom from the north side assumes the power of the corporation for some purposes over the whole width of the river; and the right to use the shear, and to stop their own logs driven indiscriminately with the logs of others, assumes the right, under the circumstances stated in the offer, to stop the mixed mass of logs for the shortest time reasonably necessary, by the use of the utmost diligence and skill, to withdraw from that mass their own logs. To decide otherwise would be to defeat the very purpose which the legislature had in view.

That this was the actual legislative intent, however, is manifest upon a careful reading of the proviso to the 7th section. It is provided that " no lumber of any description shall be stopped except upon the written request of the owner or owners of the same." Now it is plain that the stopping referred to here, is not a mere temporary interruption of the progress of the logs for the purpose mentioned, but a stopping of the logs as at the place of their destination at the request of the owner. Further, it is provided " that no toll or expense shall accrue to any lumber, designed to run or to be driven to any point below Lock Haven." If it was contemplated that such lumber was not under any circumstances to be stopped in the West Branch boom, how could any toll or expense accrue upon it? Assuming, however, that this class of lumber might and probably would at times come within the inclosure of this boom, it was reasonable and proper, conceding the right to interrupt its passage temporarily and for a lawful purpose, to make provision that there should be no toll or expense charged for turning it out.

But it is said that the identical question now under discussion was decided otherwise in West Branch Boom Co. v. Dodge, 31 Pa. 285. What the precise facts in that case were does not appear; it was an action on the case for the detention of a quantity of saw logs which ran into the defendants' boom in the spring of 1852. The jury found a verdict for the plaintiffs by consent, subject to the opinion of the court whether in law the plaintiffs were entitled to recover. Under what circumstances, for what purpose, or for what length of

time, the logs were detained, does not appear in the report of the case. The opinion may or may not be in conflict with the views here expressed; that depends wholly upon the facts upon which it is based. There are some general expressions contained in it, which might appear to be in conflict, not only with the rulings in this case, but with Susquehanna Boom Co. v. West Branch Boom Co., already referred to. These expressions, however, may be made with reference to a state of facts wholly different from the facts in this case, or in the case mentioned. However this may be, we are well satisfied that the construction we have given to this charter is the reasonable and proper one, and that it is in conformity with the rule now recognized in this state.

If the facts set forth in the offer are established by the proofs, it follows, that the defendants in stopping the plaintiffs' logs, under the circumstances and for the purposes stated, were exercising powers conferred by their charter, and for any negligent performance of these powers, would be answerable only according to the provisions of the charter: Bald Eagle Boom Co. v. Sanderson, 81* Pa. 402.

> The judgment is reversed and a venire facias de novo awarded.